**Elizabeth WHEELER, Plaintiff,**

v.

**STANDARD TOOL AND MANUFAC-
TURING COMPANY, Defendant.**

**No. 69 Civ. 5160.**

United States District Court,
S. D. New York.

March 28, 1973.

See also D.C., 311 F.Supp. 1177.

Kolsby & Wolf, P. C., Philadelphia, Pa., for plaintiff, by Allan H. Gordon, Edward L. Wolf, Philadelphia, Pa., and Norman J. Landau, New York City, of counsel.

Reilly & Reilly, New York City, for defendant, by John G. Reilly, New York City, of counsel.

DUFFY, District Judge.

The plaintiff, Elizabeth Wheeler,[1] presently a resident of the State of New York, was an employee of Becton, Dickinson & Company (hereinafter "Becton-Dickinson"), located in Canaan, Connecticut. On December 16, 1966, plaintiff was injured while operating a machine manufactured by defendant, Standard Tool & Manufacturing Company, a New Jersey corporation, with its principal office and plant located in Lyndhurst, New Jersey.

The machine was designed to assemble hypodermic syringes. While operating the machine, the plaintiff slipped and thrust her right hand forward, caught the right index finger in the needle inserting station of the machine, causing the damage of which she now complains.

The theory of plaintiff's case is not one of ordinary negligence, but is one of strict liability as against the manufacturer of a dangerous mechanism. (See Section 402(A) of the Restatement (Second) of Torts).

It is incontrovertible that in 1961, Becton-Dickinson entered into an agreement with the defendant whereby the defendant would design a certain machine known as the "plastic syringe as-

---

1. Since the start of this action the plaintiff has been married and is now known as Elizabeth Radich.

sembly machine''. The design engineers employed by the defendant had numerous conferences with representatives of Becton-Dickinson, and finally submitted to Becton-Dickinson a design for such a machine. The design was approved by Becton-Dickinson, and the defendant manufactured and delivered one machine in its first order; one machine in the second order; and in a third order in 1963 ten additional machines, substantially the same as those in the first two.

In the contract for the sale of the first two machines, the defendant assigned to Becton-Dickinson its plans and specifications for the machines since they were a specialty item.

The machine on which the plaintiff, Mrs. Wheeler, was injured, was one manufactured pursuant to the third, that is 1963, order.

The defendant's contentions include, inter alia, a denial of liability based on the claim that it "manufactured" only a component of the machine; that the machine was built to the specifications of plaintiff's employer; and that the defendant's design engineer had recommended that a guard be placed at the needle inserting station, which is the defect alleged to have caused plaintiff's injury, but that plaintiff's employer had failed to install such a guard.

Since the case was tried without a jury, the Court permitted the parties to call witnesses out-of-order for the convenience of the parties and the witnesses.

The first witness called, therefore, was Mr. Zihaly, who was produced by the defendant. Mr. Zihaly testified that he had designed the first "plastic syringe assembly machine" in consultation with certain Becton-Dickinson employees; that Becton-Dickinson had approved the design proposed by defendant; and that he supervised the manufacture of the "dial" or turntable part of the machine; and that he and others on behalf of the defendant strenuously urged Becton-Dickinson to put guards over all of the moving parts of the as-

sembled machine, including the needle inserting station. The witness testified that defendant did not put the recommended guards on the machine since "Moorbin Hoppers", a device to hold the parts from which the product was to be assembled, were ordered by Becton-Dickinson and were to be added after the machine was "manufactured" by defendant.

I find that portions of the testimony of this witness were not believable. The demeanor of the witness, shifting in his seat and speaking with hesitation and an awkward choice of words was such that he lacked the spontaneity of a person who was telling the whole truth.

The witness specifically tripped himself up when he testified that each of the machines was "set up" at the defendant's factory and run for a period so that the defendant could "de-bug" the machine. He also testified that he had gone to the Becton-Dickinson plant and had further supervised the "de-bugging" of the machines at that plant with the Becton-Dickinson mechanics.

One of the mechanics for Becton-Dickingson, Mr. Victorien, later testified that the machines were delivered to Becton-Dickinson completely assembled with the hoppers and all other parts attached. When this testimony is added to the testimony of Mr. Zihaly concerning the "de-bugging" of the machines, it is clear that while the defendant may not have produced "from scratch" the entire machine, it did assemble it and in this sense I find that the defendant did manufacture the machine in question.

This finding is further supported by the exhibits produced by the defendant itself. The second page of defendant's exhibit H is an invoice which shows:

"Material and labor to make various changes and experiments as requested on #802 Plastic Srringe, (sic) machine to accommodate variance in the product as furnished from different molds. This includes development, alterations and correction to feeders, tracks and various mechanical devices,

including detection devices to facilitate parts coming from feeders to machine. The above changes and corrections include necessary engineering labor to correct and up-date all drawings involved."

The date on this invoice is February 26, 1962.

This is specifically contrary to the testimony of Zihaly and to representations of defendant's counsel that "hoppers, bowls, tracks", etc., were to be provided by Becton-Dickinson (Defendant's Proposed Finding of Fact No. 19).[2]

Accordingly, I find that the defendant did manufacture the machine in question and that it was in the business of manufacturing such machines.

Since this case comes to this Court by way of diversity jurisdiction under 28 U.S.C. § 1332, the first step is to determine the applicable law. In the landmark decision of Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the Supreme Court held that a federal court sitting in diversity must apply the law of the state in which it sits to "substantive" questions. In Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), the Supreme Court stated that the doctrine of *Erie* required that a federal court apply the choice of law rules of the forum state. Thus New York's choice of law rules must be applied here.

New York has been among the forerunners in developing a more flexible approach to choice of law questions. In Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the New York Court of Appeals adopted a grouping of contacts theory for application to tort actions having connection with foreign jurisdictions. In essence, New York applies the law of the state with the most substantial interest in the issue in question.

■ The issue presented here is what law should be applied to the question of strict liability of a manufacturer of machines to an injured foreseeable user of such machines. At the outset, it is clear that New York law regarding strict liability in tort will not apply. The only substantial contact that New York has to the issue is that plaintiff now resides in New York, though she did not at the time of the accident. Under New York law, it is settled that a post accident change of domicile by plaintiff will not enter into a determination as to the applicable choice of law. See Gore v. Northeast Airlines, Inc., 373 F.2d 717 (2nd Cir. 1967).

■ The contacts in this case are divided between New Jersey and Connecticut. The allegedly defective machine was contracted for and manufactured in New Jersey by a New Jersey company, while the injury to plaintiff occurred in Connecticut, where the defendant had shipped the machine and where plaintiff was employed. Though New Jersey has substantial interest in the quality and standards of products manufactured within its borders, I find that its law is not applicable. In a personal injury case such as this, the dominant interest is compensation for the injury suffered. The doctrine of strict liability rests directly on a notion of compensation to the injured rather than on the notion of punishment to an intentional or negligent wrongdoer. Thus the law of the place of injury rather than law of the place of manufacture must govern because it has the paramount interest in setting the standards by which people employed in that state may recover for injuries caused there by an unreasonably dangerous product. Further, it is important to note that the plaintiff here had a substantial and ongoing contact with Connecticut in that it was the place of her employment. I, therefore, find that under the New York choice of law rules I must look to Connecticut law.

There is a relative dearth of Connecticut law on the subject of strict liability.

---

2. Defendant's counsel also tried by his proposed findings of fact to disavow a stipulation he had made at trial.

In Garthwait v. Burgio, 153 Conn. 284, 216 A.2d 189 (1965), the Supreme Court of Connecticut, by way of dictum, suggested its agreement with the rule of strict liability contained in the Restatement (Second) of Torts § 402(A), which is as follows:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Since 1965, the Courts of Connecticut and the federal courts applying Connecticut law have consistently applied the rule stated in § 402(A) in cases of strict liability. Wachtel v. Rosol, 159 Conn. 496, 271 A.2d 84 (1970); Rossignol v. Danbury School of Aeronautics, Inc., 154 Conn. 549, 227 A.2d 418 (1967); Basko v. Sterling Drug, Inc., 416 F.2d 417 (2nd Cir. 1969); DiMeo v. Minster Machine Company, 388 F.2d 18 (2nd Cir. 1968). Thus, under Connecticut law, i. e., § 402(A) of the Restatement (Second) of Torts, it is incumbent on me to determine whether the absence of a guard at the needle inserting station was a "defective condition unreasonably dangerous to the user" of the machine.

The plaintiff produced Professor Edgar, a mechanical engineer, who testified that he had examined the machine in question and that he considered the lack of a guard at the needle inserting station to be a defect which was unreasonably dangerous to the user.

Mr. Zihaly, the defendant's own witness, testified that he believed that guards should be placed over the moving parts of any machine and that he and others in the defendant's employ had strongly urged Becton-Dickinson to use guards and particularly to use a guard at the needle inserting station.

In the face of this testimony, I cannot but find that the machines built by defendant were sold "in a defective condition unreasonably dangerous to the user".

Standard argues that it expected Becton-Dickinson to substantially change the condition of the machines and therefore it is not strictly liable under the rule stated in Section 402(A). I find that to be erroneous. Defendant, as Mr. Zihaly testified, suggested to Becton-Dickinson that guards be placed on the machine. However, there is no indication that Becton-Dickinson ever affirmatively indicated to defendant that it intended to add the guards. In fact, there is evidence that Standard itself added one guard, apparently aware of Becton-Dickinson's lack of intent to do so. I, therefore, conclude that defendant could not have labored under a reasonable expectation that Becton-Dickinson would add such devices.

Even if defendant had a reasonable expectation that Becton-Dickinson would make substantial changes, it is not clear that the Connecticut courts would apply the expectation rule of Section 402(A)(1)(b) to avoid strict liability in this case. The Connecticut courts have not been directly faced with application of the expectation rule to the type of circumstances presented here. Thus, this Court must attempt to divine the result that the State court would reach. See Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 178, 76 S.Ct. 273, 100 L.Ed. 199 (1956).

Where the relevant law is interstitial, this Court must look to treatises and the law as articulated by other states which have the same general rules, but before whom a parallel case has appeared. The Restatement is an important codification of existing law, but it, of necessity, suffers the defect of time lag. It cannot stay absolutely current nor can it glean out all the corners to which the law is headed. The expectation rule as stated in Section 402(A) has been rejected by some courts. In particular, the Supreme Court of New Jersey, in Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972), a case strikingly similar to the present one, held that the manufacturer's expectation cannot immunize him from liability. The Court said,

> "Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates unreasonable risk of harm, and where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him. The public interest in assuming that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser." 290 A.2d at 281.

Thus, the New Jersey court placed the duty squarely on the manufacturer's shoulders, and this Court thinks Connecticut might well place the duty in the same place.

We come then to a determination of what happened on the day of plaintiff's accident and thereafter. The machine which plaintiff was operating was not up to par; the needles were jamming up on the track leading them to the needle inserting station; and *as usual*, the barrels of the syringes were falling on the floor around the plaintiff. It was part of the plaintiff's duties to clear away the barrels and other components of the syringes which fell from the machine. While going to adjust the needles on the needle track, the plaintiff slipped, possibly on something which had fallen from the machine, and she fell forward; instinctively she put her hand out to break the fall, and thus her right index finger got caught in the mechanism of the machine at the needle inserting station. The mechanism tore back about three-quarters of the flesh exposing the bone between the hand and the first joint of the index finger. The machine was stopped but it took the mechanics about one-half hour to remove the plaintiff from the machine so that she could be treated. At Becton-Dickinson she was seen by Dr. Eliot who gave first aid and sent plaintiff to Sharon General Hospital for surgical repair of the finger. After the wound had closed, the plaintiff underwent physical therapy in an attempt to bring the finger back to normal operation.

Since the finger was not back to normal, the plaintiff underwent further surgery in mid-1968. This surgery, which hospitalized the plaintiff for four or five days, did not relieve the condition of which the plaintiff complains. The plaintiff now has approximately fifty per cent use of her right index finger.

The defendant contends that the plaintiff was contributorily negligent and that she "assumed the risk" in the injury to her finger. The defendant contends that in slipping on approaching the machine, plaintiff failed to shut off the machine, although there was a control switch two and one-half feet from the needle inserting station; and that her slipping was caused by her failure to clean up the area from the barrels, needles and other paraphernalia which fell from the machine. The plaintiff slipped before she reached the control panel and even if, as defendant contends, it was part of her duties to clean up the components of the plastic syringe, I find she cannot have been contributorily negligent if one of the components fell from the machine, since the machine ordinari-

ly threw off these components. The defendant knew that this was to be expected in the ordinary operation of the machine.

Reducing defendant's claim to its most simple formulation, it is argued that strict liability should never apply because the user of the mechanically defective device would be guilty of contributory negligence merely by using the defective device even though the user had no knowledge or reasonable expectancy of the damage which could be incurred in the ordinary use of the machine.

This is pure sophistry and it is for this reason that contributory negligence is not recognized as a defense to strict liability under Section 402(A) of the Restatement (Second) quoted above. The claim of "assumption of the risk" is likewise without any foundation in fact.[3]

I come then finally to the question of damages. The plaintiff has spelled out certain special damages. The medical expenses incurred by the plaintiff total $872.10. This includes

$202.00 paid to Dr. Frank Lovallo;
$393.10 paid to Pittsfield General Hospital;

$142.00 paid to Dr. J. Neary; and $35.00 paid to Dr. John Elliott

Plaintiff also alleges that she is entitled to compensation for her loss of earnings from an "Avon Route" and her usual after-hours' job as a waitress. I cannot find that either claim is very persuasive. The plaintiff also claims that her earning power should be considered as that of a lathe operator (or operator of other industrial machines). It is true that plaintiff had some experience on these machines but I cannot measure the plaintiff's claims on the basis of her little experience and potential.

However, I find that plaintiff in her badly damaged and hideously scarred finger will suffer continuing pain and suffering (not only physical but mental).

I therefore find that the plaintiff is entitled to recover from the defendant the sum of $12,500 for her general damages and also $872.10 as special damages.

Settle order on notice.

---

3. The other arguments raised by defendant are likewise without merit.