**Lewis G. DUKE and Margaret Duke, Respondents,**

v.

**GULF & WESTERN MANUFACTURING CO., Appellant.**

**No. WD 32,672.**

Missouri Court of Appeals, Western District.

Oct. 18, 1983.

William T. Smith, III, Kansas City, for appellant.

Gordon N. Myerson, Kansas City, for respondents.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Judge.

In this product liability case, Gulf & Western Manufacturing Co., the manufacturer of a die-press which injured plaintiff Lewis Duke's hands, appeals from jury verdicts in favor of Mr. Duke and his wife. The company asserts among other things that the judgment must be reversed because the plaintiffs failed to link alleged defects in the die-press to their injuries, because plaintiffs failed to offer evidence of the costs of design alternatives, and because the die-press was substantially altered by the purchaser. We affirm.

On October 24, 1975, plaintiff Lewis Duke was operating a power press manufactured by E.W. Bliss Co. (now an operating division of Gulf & Western) and sold to Gleaner· Co. (the predecessor of Allis-Chalmers, Mr. Duke's employer). The press was multifunctional and could be fed from the front, rear or sides by automatic, semi-automatic or manual means. It was capable of notching, bending, punching, stamping, embossing, cutting, blanking, shearing, and drawing metal.

Mr. Duke had been employed at Allis-Chalmers for seventeen years and had operated that particular press for three or four years. While operating the press that day, something struck him in the head and the next thing he knew, his hands were in the press. Although ordinarily the press would descend only one time, it descended on his hands two or three times, requiring the amputation of two fingers on each hand.

Mr. and Mrs. Lewis filed their amended petition against Gulf & Western on October 9, 1979, claiming in Count I that the press "as designed, manufactured, assembled and/or sold by defendant was defective and unreasonably dangerous" because of a failure to provide adequate safety guards, defective design of certain machine components, and for failure to warn of the danger of operating the press as designed. On this product liability theory, plaintiffs sought $1,500,000 in damages. Count II sought $1,500,000 for breach of express and implied warranties. In Count III, plaintiffs sought· $1,500,000 for negligence for the same failures and defects listed in Count I, and in Count IV, prayed for $32,000,000 in exemplary damages. Finally, in Count V, Margaret Duke sought $450,000 for loss of consortium resulting from her husband's injuries.

At trial, plaintiffs' witness, Dr. Donald L. Creighton, professor of machine design at the University of Missouri at Columbia, testified that the press is operated by engaging in the clutch which causes the gear to make one complete revolution, driving the crank down and back up. This forces the two halves of the die together, shaping the metal stock between them.

To engage the clutch, a trip rod is pulled down, which operates the clutch by means of a "latch mechanism." The trip rod is attached to the latch mechanism by a "clevis pin" and secured by a ¾" × ¹⁄₁₆" "cotter key" or "cotter pin." According to Dr. Creighton, this was not a proper method of attachment. He also criticized the lack of a return spring as a means of preventing the press from running continually in the event of a failure anywhere below the latch bracket. After Mr. Duke's accident, Theodore Williams, general foreman of maintenance at Allis-Chalmers, designed a new means of securing the cotter key, using a "castellated" nut said by Dr. Creighton to be of a superior and safer design.

Dr. Creighton also testified that certain safety guards were available at the time the press was manufactured in 1949 and brought several 1948 advertisements for such guards to trial to make his point. (Objection to these exhibits as hearsay was sustained.) Without guards, he said, the press was "unreasonably dangerous and defective." He also stated that the press was defective when sold because it did not warn of the danger of operation without guards in place. Further, the latch mechanism, without a return spring and with a ¹⁄₁₆" cotter key, was defective.

Mr. Duke testified that a few years before the accident, the original mechanical foot pedal mechanism had been replaced by palm buttons, the purpose of which was to force the operator of the press to remove his hands from the die area during operation. The buttons electrically actuate the air cylinder which pulls down the trip rod, eliminating the need to do this manually.

Mr. Williams testified for plaintiffs and stated that he arrived at the scene two minutes after the accident and that when he started up the press, it would not shut off at the end of a stroke. He found no damage to the clutch parts except a bend in one ear of the "clevis" (securing the trip rod), a bend which Dr. Creighton testified could not have occurred unless the cotter pin slipped out of place. Mr. Williams also stated that he found the clevis jammed past the stop pin.

Defendant's witness, Wayne Myslivy, supervisor foreman at Allis-Chalmers, testified that no guard existed for this type of press.

Peter Bosch, Manager of Product Reliability for E.W. Bliss, Co. agreed that guards should be used where practicable, but that in 1949, the practice was to provide them for special purpose presses but not for multi-purpose presses such as the one at issue. The reason was that when the actual use is not known to the manufacturer, a meaningful point-of-operation safeguard for all potential uses cannot be provided. In the opinion of Mr. Bosch, because Bliss could not foresee all the uses intended by purchasers, this press when manufactured in 1949 without point-of-operation guards, was neither defective nor unreasonably dangerous. He testified that in 1949, no one guard existed which could adequately protect all reasonably anticipated press operations. He did not believe that warning signs could provide any safety to the operator because they do not restrain or prevent unsafe operation. He did admit, however, that if the cotter key had remained in place, the accident would not have occurred.

Defendant's motion for directed verdict on Counts II (warranties) and IV (exemplary damages) having been sustained, the jury ruled in plaintiffs favor on the remaining counts and awarded $100,000 to Lewis Duke and $25,000 to Margaret Duke.

Defendant filed a motion for judgment notwithstanding the verdict or for new trial and in response, the court issued an order dated April 6, 1981, denying the motion and stating that although the plaintiffs had not made a submissible case as to a defective condition resulting from either the failure

to provide safety guards or the failure to warn of the lack of such guards, they had presented a submissible case that "the press was in a latently defective condition and unreasonably dangerous when put to a reasonably anticipated use because of an inadequate method of attaching the trip rod to the latch lever." The court further stated that "there was evidence that the cotter key ... was of 1/16″ thickness and of insufficient strength to withstand extensive use and wear" and that the substantial alterations made to the press after sale were not of such a nature "that their use would not have been reasonably anticipated by defendant as a matter of law."

On appeal from that judgment, defendant raises the following points: (1) plaintiffs failed to make a submissible case because they never offered testimony linking the press defects to their injuries; (2) plaintiffs failed to offer any evidence of the costs and detriments of design alternatives; (3) the evidence showed the press had undergone substantial alteration which defendant could not have reasonably anticipated and which constituted an independent intervening cause; (4) as a matter of law, manufacturers need not install guards on multi-purpose presses, and on the contrary, that duty rests with the employer; (5) plaintiffs improperly and repeatedly referred to evidence of a "new latch bracket" and certain advertisements for power press guards; (6) the trial court erred in failing to give withdrawal instructions on the issues of warning and guarding; and (7) the verdict was against the weight of the evidence.

### 1. *Causation*

■■■ In considering defendant's first contention that the trial court erred in overruling its motions for directed verdict and judgment notwithstanding the verdict because the plaintiffs failed to make a submissible case on the issue of causation, we must view plaintiffs' evidence in the light most favorable to plaintiffs and disregard defendant's evidence except insofar as it tends to aid plaintiffs' case. *Franklin v. Farmers Mut. Ins. Co.,* 627 S.W.2d 110, 113–14 (Mo.App.1982). Sustaining a motion for a directed verdict is a drastic action and should only be done when all the plaintiff's evidence and reasonable inferences which may be drawn therefrom are so strongly against the plaintiff that reasonable minds cannot differ. *Teachenor v. DePriest,* 600 S.W.2d 122, 124 (Mo.App.1980).

■■■ Defendant argues nevertheless that a directed verdict was warranted here because plaintiffs failed to offer expert evidence linking the defects in the power press to the accident in which Mr. Duke was injured.[1] Proof of causation is an indispensable element of a plaintiff's case under a product liability theory.[2]

■■■ We find no merit in defendant's argument here. The record is replete with evidence from which the jury could have inferred that design defects caused Mr. Duke's injuries.

Plaintiffs' expert, Dr. Creighton, testified that the power press was by design defective in many respects. One of these was the attachment of the trip rod to the clutch by means of a 1/16″ cotter key or pin. Dr. Creighton testified that the pin used was too small and an improper means of connecting the trip rod because of the stress and load placed upon the pin with each rotation of the press. If the method of attachment fails at the connection point, Dr. Creighton stated, the clutch will not

---

1. Defendant finds fault as well with plaintiffs' expert evidence because, it claims, proper foundation in the form of a question hypothesizing the facts of the case was lacking. At trial, however, defendant made not a single objection to Dr. Creighton's testimony on this ground and, therefore, the point has not been preserved for review. *State ex rel. State Highway Comm'n v. Northeast Bldg. Co.,* 421 S.W.2d 297, 301 (Mo.1967).

2. *See Blevins v. Cushman Motors,* 551 S.W.2d 602, 608 (Mo.1977) (en banc), stating that plaintiff must prove that he was injured while using the product in a way it was intended to be used and as a result of a defect in design and manufacture of which he was unaware and which made the product unsafe for its intended use.

disengage at the end of the stroke and the press will continue to trip. He described the means of attachment as "just terrible design because it's taking a risk there's no need to take."

This testimony in connection with evidence that the clevis was bent and further testimony by Dr. Creighton that for this to happen the cotter pin must have slipped out of place, leads to the reasonable inference that the cotter pin failed. Although, as defendant correctly points out, Dr. Creighton himself never went on to state that this failure caused the accident,[3] defendant's own witness, Peter Bosch, filled in this gap by stating that if the cotter key had remained in place, the accident would not have happened. In addition, Mr. Williams specifically testified that the pin (or key) was missing and that the loss of the pin was the cause of the accident. In light of this evidence and the fact that we must indulge all inferences favorable to plaintiffs and disregard defendant's evidence to the contrary, we cannot say the trial court erred in submitting the question of causation to the jury.

## 2. Design Alternatives

■ Defendant's second point, that plaintiffs' case-in-chief was insufficient because it failed to present evidence of the costs and detriments of design alternatives, raises a question which has had little attention in Missouri. The question: whether such evidence must be presented in order to make a prima facie case or whether the burden of presenting such evidence falls on a defendant to rebut the characterization of the defect as "unreasonably dangerous."[4]

The concept of strict liability in tort was first adopted in Missouri for defective manufacture of products in *Keener v. Dayton Electric Mfg. Co.,* 445 S.W.2d 362, 364 (Mo. 1969), recognizing the definition of the cause of action in Restatement (Second) of Torts § 402A (1965).[5] The *Keener* court

---

**3.** Defendant cites the rule that expert testimony is necessary where the lay person cannot reasonably infer the causal effect of a defect and seems to interpret the rule to require an expert to say specifically "this defect caused this accident." Such clear testimony is certainly preferable. But the very cases cited by defendant show that this is not an indispensable prerequisite to a submissible case. In *Kappel v. Slickman,* 401 S.W.2d 451, 453 (Mo.1966), the court stated that although the plaintiff had not met his burden of proof on causation, that burden may be met by circumstantial evidence. In *Kinealy v. Southwestern Bell Tel. Co.,* 368 S.W.2d 400, 404 (Mo.1963), the court stated that "the facts or circumstantial evidence" were insufficient to support an inference of causation without expert testimony and in fact were so insufficient, the expert himself refused to give a professional opinion. It did not hold that facts, when more substantial, may never, without expert testimony, support such an inference. *Hart v. Steele,* 416 S.W.2d 927, 931–32 (Mo.1967), dealt specifically with the need for expert *medical* testimony to show that a *standard of care* had not been met in medical malpractice cases. The requirement for expert testimony for *causation* was not discussed. *Lifritz v. Sears, Roebuck and Co.,* 472 S.W.2d 28, 32–33 (Mo.App.1971), held that absolute certainty of causation is not required in a product liability case and that "probative facts" established by circumstantial evidence and pointing to the desired conclusion with enough certainty to be reasonable and probable is sufficient.

**4.** A finding of "unreasonably dangerous" is a necessary element for strict liability for product design as evidenced by MAI 25.04 (1978 Revision) which provides as follows:

> Your verdict must be for plaintiff if you believe:
> First, defendant sold the (product) in the course of defendant's business, and
> Second, the (product) was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and
> Third, the (product) was used in a manner reasonably anticipated, and
> Fourth, plaintiff was damaged as a direct result of such defective condition as existed when the (product) was sold.

**5.** That section provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold.
> (2) The rule stated in Subsection (1) applies although
> (a) the seller has exercised all possible care in the preparation and sale of his product, and

specifically acknowledged the public policy that the cost of injury from a defective product must be borne by the manufacturer rather than by the consumer who is ill-equipped either to afford the loss or protect against the failings of the product.

The cause of action recognized in *Keener* for defectively *manufactured* products was extended to defectively *designed* products in *Blevins v. Cushman Motors,* 551 S.W.2d 602 (Mo.1977) (en banc). In doing so, the Missouri Supreme Court found "no rational distinction" between the manufacture and the design of a product in the strict liability context and reaffirmed that a product may be found to be "unreasonably dangerous" and actionable under § 402A when it is "defective and dangerous when put to a use reasonably anticipated." *Id.* at 607. The *Blevins* court carefully drew a line of distinction between a negligence cause of action and strict liability, quoting at 608 from *Phillips v. Kimwood Machine Co.,* 269 Or. 485, 525 P.2d 1033, 1037 (1974) (en banc), as follows:

> [I]n strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did. The article can have a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were

entirely reasonable in view of what he knew at the time he planned and sold the manufactured article.

The opinion left open the question of the degree of proof of "dangerousness" required for a prima facie case. The question is a difficult one in a case of design defect. In a manufacturing defect case the jury can rather easily determine whether a single product conforms to the intended design. The jury in a design defect case, however, may have no external standard by which to measure the design, or at least the standard with which the design should have complied is not always naturally apparent.

Further, while a determination that a product was defectively manufactured affects only that single product, a determination of defective design affects all such products produced by that manufacturer and may involve enormous cost.

All these considerations have resulted in extensive debate as to whether the burden of showing the cost of alternative designs (by means of a "risk-benefit" analysis) should rest on the plaintiff as part of his prima facie case, or on the defendant.[6]

The suggested components of such a "risk-benefit" analysis have been listed by Professor John W. Wade of Vanderbilt University in Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837–38 (1973) as follows:

---

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

**6.** Not only are the jurisdictions split as to this question, many courts finding such evidence relevant have not made clear where the burden lies. For holdings relieving plaintiffs of the burden, *see Barker v. Lull Eng'g Co., Inc.,* 20 Cal.3d 413, 573 P.2d 443, 446, 143 Cal.Rptr. 225, 228 (1978); *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979); *Mitchell v. Fruehauf Corp.,* 568 F.2d 1139, 1144–45 (5th Cir.1978) (holding plaintiff made a submissible case by showing that alternative designs were feasible when *defendant* offered no proof that they were not economically feasible). For holdings imposing the burden on plaintiffs, *see Wilson v. Piper Aircraft Corp.,* 282 Or. 61, 577 P.2d 1322, 1327 (1978) (en banc) (holding that plaintiffs cannot submit allegations of improper

design unless the court is satisfied that the jury could find the alternative technically and economically feasible); and *Turner v. General Motors Corp.,* 584 S.W.2d 844, 849 (Tex.1979) (holding that the appropriate factors which must be balanced should be "overtly advanced" by *both* parties, but that the jury should not be specially instructed as to these factors). For cases finding such evidence relevant but without holding as to who bears the burden, *see Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460, 432 N.E.2d 814, 818 (1982); *Torre v. Harris-Seybold Co.,* 9 Mass.App. 660, 404 N.E.2d 96, 108 (1980); *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743 (Tex.1980); *Morningstar v. Black & Decker Mfg. Co.,* 253 S.E.2d 666 (W.Va.1979); *Seattle-First National Bank v. Tabert,* 86 Wash.2d 145, 542 P.2d 774, 799 (1975) (en banc).

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.[7]

The question, however, is one most relevant to those cases where the defective product is enormously complex, one whose design alteration may have implications beyond the range of understanding of the non-technical layman. Where the defect is simple and one which the ordinary consumer can easily understand on the basis of common knowledge, the cases have not imposed a risk-benefit analysis requirement.

For example, in *Passwaters v. General Motors Corp.*, 454 F.2d 1270 (8th Cir.1972), plaintiff was a passenger on a motorcycle injured by the ornamental blades on an automobile hubcap. The court held that evidence that the blades were ornamental

was sufficient to permit the jury to find that hubcaps of a safer design were practicable. Similarly, in *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1322, 1327 (1978) (en banc), the court stated:

[B]y way of example, plaintiffs alleged in this case that the aircraft was not equipped with crashworthy shoulder harnesses and crashworthy seat belt brackets and attachments. There was evidence that workable shoulder harnesses and safer seat belt attachment designs were available when the airplane was manufactured. *A court and jury could infer, on the basis of common knowledge, that the addition of shoulder harnesses and improved seat belt attachments would not significantly affect the over-all engineering of the airplane and would not be unduly expensive.* (Defendant would, of course, be permitted to offer evidence to the contrary.) (Emphasis added.)

Although this policy has not been specifically stated in Missouri, cases involving design defects of a simple nature have consistently been found to be submissible on the basis of an expert opinion that an alternative design was feasible. An extensive risk-benefit analysis has not been imposed. *See Blevins v. Cushman Motors, supra* (holding that where plaintiffs had presented evidence that stability of a golf cart could be improved by widening the wheel base, using four wheels, lowering the center of gravity, increasing the minimum turning radius and decreasing the maximum speed, they had made a submissible case, no risk-benefit analysis having been required by the court); *Bender v. Colt Industries, Inc.*, 517 S.W.2d 705 (Mo.App.1974) (mentioning no need for risk-benefit analysis where the evidence showed that a "safety" on a revolver was defective and that a modern safety could have been placed on the gun); *Cryts v.*

---

7. *See also* Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30, 37–38 (1973). Other lists of suggested factors appear in Dickerson, *Products Liability: How Good Does a Product Have to Be?,* 42 Ind.L.J. 301, 331 (1967) (five factors); Fischer, *Products Liability—The Meaning of Defect,* 39 Mo.L.Rev. 339, 359 (1974) (fifteen factors); Montgomery

and Owen, *Reflections on the Theory and Administration of Strict Tort Liability for Defective Products,* 27 S.C.L.Rev. 803, 818 (1976) (four factors); Shapo, *A Representational Theory of Consumer Protection: Doctrine, Function and Legal Liability for Product Disappointment,* 60 Va.L.Rev. 1109, 1370–71 (1974) (thirteen factors).

*Ford Motor Co.,* 571 S.W.2d 683 (Mo.App. 1978) (mentioning no risk-benefit requirement for an automobile armrest that could have been padded to increase its energy-absorbing capacity); and *Higgins v. Paul Hardeman, Inc.,* 457 S.W.2d 943 (Mo.App. 1970) (holding that where a defective dump truck control rod had been "redesigned" after a fatal injury with minimal time and expense by the truck owner to make accidental tripping of the rod avoidable, plaintiff had made a submissible case).

· ■ Accordingly, although the question whether a risk-benefit analysis is essential to a prima facie case in technologically complex design defect cases has not yet been decided in Missouri, our courts have consistently found that in technologically simple cases, a submissible case can be made absent such an analysis.

This case requires an understanding of alternative designs for three conditions alleged to be unreasonably dangerous.[8] Two are inherently simple and as to the third, evidence of feasibility was present. The evidence showed that the first, lack of warning, was remediable by a warning placed directly on the press. The second, redesign of a simple $\frac{3}{4}'' \times \frac{1}{16}''$ attachment pin said to be defective by several witnesses, had in fact already been accomplished by an Allis-Chalmers employee who believed that the pin had caused the accident and who simply replaced it with a pin secured by a nut "to prevent further accidents." This change was said by plaintiffs' expert, Dr. Creighton, to be of a superior and safer design. We believe that neither adding a warning sign nor adding a nut to secure a pin constitutes a design change requiring extensive analysis or testimony showing it

to be economically feasible. The common knowledge of most laymen extends to an understanding that the addition of a warning or a nut is not the type of change which would make a product "too expensive to maintain its utility." *Wilson v. Piper Aircraft Corp., supra,* 577 P.2d at 1326. Because this question is at least as understandable to a layman as the dump truck control rod in *Higgins,* the revolver safety in *Bender,* or the golf cart design in *Blevins,* we find no need to go beyond the "technologically simple" rule.

■ As to the third condition, the lack of safety guards, adequate evidence of the feasibility of providing such guards—both as to cost and technological possibility—was before the jury. The deposition of defendant's witness, Peter Bosch, was read into evidence showing that the cost of interlocking barrier guards on Bliss punch presses was probably $1000 or less, or five to ten percent of the cost of the press. The deposition also showed that the cost was not the reason safety guards were not installed by Bliss. In addition, Dr. Creighton's testimony showed, among other things, that these interlocking barrier guards were available at the time of manufacture and were adjustable so that one guard was not restricted to only one type of operation. Instead, for wider or heavier stock, different size pieces, or different kinds of runs, the barriers could be moved to accommodate the changes.

Accordingly, whether or not Missouri makes the decision to impose upon strict liability plaintiffs the burden of presenting a risk-benefit analysis in technologically complex cases, plaintiffs made a submissible case here.[9]

**8.** Although the trial court ruled in its order of April 6, 1981, in response to defendant's motion for judgment n.o.v. or for new trial that plaintiffs had not made a submissible case as to either the failure to provide safety guards or the failure to warn, we do not consider these issues erased from the case. For a thorough discussion of our reasons and treatment of these issues, see sections four and six.

**9.** For comparable treatment of a similar factual situation, *see 141 So. Main, Inc. v. Magic Fin-*

*gers, Inc.,* 49 Ill.App.3d 724, 7 Ill.Dec. 444, 447, 364 N.E.2d 605, 608 (1977), where the court stated that although it had "some doubts" as to whether evidence of costs, practicability and technological feasibility of alternative designs was essential to plaintiffs' case rather than "merely relevant or material", a decision on that point was unnecessary because of the relative simplicity of the product, its defects and the alternatives.

### 3. *Substantial Alteration*

In its next point, defendant contends that the trial court should have sustained its motion for a directed verdict and post-trial motions because the evidence established that the press had been substantially altered in a manner which was not reasonably foreseeable and that the alteration constituted an independent, intervening cause. In so arguing, defendant refers to the replacement of the original mechanical foot pedal with the two-hand palm button control system.

To recover on a strict liability theory, a plaintiff must prove, among other things, that the product was used in a manner reasonably anticipated. *See* MAI 25.04, footnote four. Although substantial changes in a product may in some cases relieve a defendant of liability, that is not so "if the changes were foreseeable and the changes did not unforeseeably render the product unsafe." *Vanskike v. ACF Industries, Inc.,* 665 F.2d 188, 195 (8th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). *See also Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1020 (8th Cir.1974).

Gulf & Western is not relieved of liability, then, if the changes were foreseeable and did not make the product unsafe. As to the first, defendant all but concedes that the replacement was reasonably foreseeable. The evidence showed that such replacements were commonly added to power presses prior to 1949 and in fact defendant's witness, Frank Holland, consultant on the control and safeguarding of power presses, estimated that 5% of the presses used in that period had this type of alteration. Bliss itself was advertising one such system in its power press handbook at that time.

Defendant's major argument centers on the second condition, namely, whether the alteration was so improperly made that it rendered the machine unsafe. The primary "flaw" in the replacement system alleged by Gulf & Western is the absence of a regulator. That is critical because, according to Mr. Holland, the amount of force necessary to actuate the clutch was twenty to fifty pounds, and pressure in excess of that amount could damage the clutch.[10] The replacement system installed by the purchaser could exert three hundred pounds of pressure. This pressure could be controlled, however, by a regulator. Defendant's position apparently is, then, that the regulator was not there, and therefore the pressure was uncontrolled, rendering the machine unsafe.

On this question, maintenance foreman Theodore Williams agreed that the replacement system could possibly put more strain on the clutch parts, although "[i]t wouldn't have [to] in every case." Mr. Holland testified that he saw no regulator in the line serving the tripping mechanism but that, because he did not take the cylinder apart, he could not tell whether a regulator was inside it. If that were all that the evidence showed, defendant's point might have merit. However, Dr. Creighton testified while looking at a photograph of the press that "something back there" looked as though it might have been a regulator, but that he could not tell for sure. More convincingly, Mr. Williams remembered that a regulator was on the press prior to the accident. Viewing this somewhat conflicting evidence most favorably to the plaintiffs, we cannot say that the trial court erred in allowing the jury to determine whether the regulator was actually there and, accordingly, whether the alteration was properly made.

### 4. *Duty to Install Guards*

Defendant next urges us to hold that, as a matter of law, because a manufacturer cannot know the exact use a purchaser may make of a multi-purpose press, it is not required to install point-of-operation guards, and on the contrary, the duty

---

**10.** This was at least partially contradicted by Dr. Creighton who testified that although "twenty to fifty pounds" may actuate the clutch, that does not indicate what force the clutch was designed to take. Because it was designed with a foot pedal, the force exerted was whatever the operator put on the pedal.

rests with the employer.[11] We decline to do so.

None of the cases cited by defendant so holds. Defendant's principal case, *Gordon v. Niagara Mach. & Tool Works,* 574 F.2d 1182 (5th Cir.1978), declined to find a multi-functional, general purpose press *per se* defective when marketed without safety guards, but held that in certain circumstances (as when warnings are absent), the manufacturer may be liable. Further, both *Christner v. E.W. Bliss Co.,* 524 F.Supp. 1122 (M.D.Pa.1981), and *Powell v. E.W. Bliss Co.,* 529 F.Supp. 48 (E.D.Pa.1981), found the question to be one for the jury. Finally, in *Rios v. Niagara Mach. & Tool Works,* 12 Ill.App.3d 739, 299 N.E.2d 86 (1973), *aff'd on other grounds,* 59 Ill.2d 79, 319 N.E.2d 232 (1974), the Illinois Supreme Court explicitly rejected at 319 N.E.2d 236 the appellate court's analysis of this issue:

> Although not necessary to our decision we consider it appropriate to comment upon the statement of the appellate court that where machines are "multi-functional and where different types of safety devices would necessarily be required to obtain reasonable safety in performing these variable functions, no duty should be imposed upon the manufacturer to provide any safety devices before the machine leaves his control." *Suffice it to say that our affirmance of the appellate court judgment should not be construed as an acceptance of this theory. Although the multi-functional nature of a product would be a factor to consider in determining whether a product is unreasonably dangerous, it would not necessarily be decisive of that question.* (Emphasis added.)

In spite of defendant's characterization of safeguarding by the manufacturer as inherently infeasible, this case graphically demonstrates that the question must remain one for the jury. Plaintiffs' witness, Dr. Creighton, extensively described various types of guards available at the time of manufacture, including guards which could be moved and adjusted to accommodate different widths and thicknesses of stock, different pieces, and different kinds of runs, concluding specifically that "[i]t doesn't mean if you have one barrier guard you can only do one type of operation." In response to the statement on cross-examination, "[u]ntil you know how its going to be fed and ejected, you can't really adequately design a guard that will protect the operator in all operations," he stated, "No, I won't agree with that." Reacting to the question of whether a manufacturer must choose between selling a multi-purpose press or limiting its purpose, Dr. Creighton testified, "You're saying you would limit the purpose of the press. There's no question but it's limited as soon as you design it. You decide the crank shaft diameter and you've decided the capacity of the press, and you've made lots of other decisions and you've limited the press. And whatever you do you cannot, by calling it a multi-functional press, excuse marketing an unsafe press. That you can't do."

Of course, Dr. Creighton's testimony was rebutted by defendant's witnesses, but the fact remains that the jury heard evidence that certain adjustable guards could have been installed and that the press could have been made safe by a safety-conscious design. We cannot say that if the jury believed Dr. Creighton, it was nevertheless wrong.

In urging that as a matter of law the employer had the duty to safeguard the presses, defendant directs our attention to certain OSHA regulations, 29 CFR § 1910.-217(c) and (d), and Missouri statutes,

---

11. Although the trial court, in ruling on defendant's motion for judgment n.o.v., held that plaintiffs did not make a submissible case on safety guards, this issue is not erased from this case. The verdict director, see footnote four, asked the jury to determine whether a "defective condition unreasonably dangerous" existed. Because evidence was presented on three possible defects—lack of warning, lack of guards, and defective mechanisms—and at no time was the jury admonished to consider only defective mechanisms, the possibility remains that the jury may have found the defective condition to exist in one of the "insubmissible" conditions. That being so, we must consider those issues to be alive.

§§ 292.020 and 292.210,[12] imposing this duty. Although we note that neither the federal regulations nor the Missouri statutes was in effect in 1949 and that neither was placed in evidence at trial, even if the employer did have a duty to safeguard presses,[13] that duty would be no defense to defendant. At best, it would simply mean that not only did the manufacturer fail adequately to safeguard the machine, the employer as well did so. That does not absolve defendant of liability. As the court persuasively stated in *Bexiga v. Havir Mfg. Co.,* 60 N.J. 402, 290 A.2d 281, 285 (1972):

> Where a manufacturer places into the channels of trade a finished product which can be put to use and which should be provided with safety devices because without such it creates an unreasonable risk of harm, and *where such safety devices can feasibly be installed by the manufacturer, the fact that he expects that someone else will install such devices should not immunize him.* The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser. The only way to be certain that such devices will be installed on all machines which clearly the public interest requires ... is to place the duty on the manufacturer where it is feasible for him to do so. (Emphasis added.)

*See Ladwig v. Ermanco Inc.,* 504 F.Supp. 1229, 1234 (E.D.Wis.1981), and *Wheeler v. Standard Tool and Mfg. Co.,* 359 F.Supp. 298, 303 (S.D.N.Y.1973), *aff'd,* 497 F.2d 897 (2nd Cir.1974), accepting and applying this same principle. *See also Roy v. Star Chopper Co., Inc.,* 442 F.Supp. 1010, 1021 (D.R.I. 1977), *aff'd,* 584 F.2d 1124 (5th Cir.1978), stating that "[t]he *Bexiga* rule is consistent with the dual rationale of products liability—that the manufacturer is better able to distribute the costs of accidents and develop an all-purpose safety device."

The question of who *should* guard rather than whether Gulf & Western *could* guard is a "false issue of fact" with "only the most tenuous, if any, relevance to the question of feasibility." *Murphy v. L & J Press Corp.,* 558 F.2d 407, 411–12 (8th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978) (rejecting admissibility of these same OSHA regulations offered for the same purpose of putting the duty to safeguard multi-purpose presses on the employer). *See also Union Supply Co. v. Pust,* 196 Colo. 162, 583 P.2d 276, 283 (1978) (en banc) ("[i]n strict liability cases, we are not concerned with who had the duty to provide guards, but rather whether the [machine] was in a defective condition unreasonably dangerous because of the failure to provide safety guards before it reached the ultimate user or consumer").

Accordingly, we hold that whether or not the employer had a duty to safeguard, the defendant was not as a matter of law absolved of liability. Further, the question of whether a multi-purpose press sold without safeguards is in a defective condition is one for the jury.

### 5. References to a "new latch bracket" and Certain Advertisements for Power Press Guards

Defendant next asserts that because of plaintiffs' "repeated references" to a new latch bracket and to advertisements from a British journal for power press guards, its posttrial motion for judgment n.o.v. or new trial should have been sustained. On close examination of the trial court's rulings on those points, we can find no error.

Defendant first complains that the trial court overruled its motion in limine regarding the latch bracket. On the contrary, the record shows that the court reserved ruling on this motion, stating that

---

12. All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated.

13. Note *Christner v. E.W. Bliss Co.,* 524 F.Supp. 1122, 1126 (M.D.Pa.1981), holding specifically that subsequent regulations directing employers to provide safety guards on power presses do not absolve a manufacturer of liability under Restatement (Second) of Torts § 402A.

because of a dispute on the facts, "we'll just have to play that by ear and handle the evidence as it's offered." Similarly, defense counsel claims that the court overruled his objection to a reference to the bracket in plaintiffs' opening statement, but the record shows that because the court could not yet judge the relevance of the issue, it took the objection under advisement. In view of the court's uncertainty as to relevance, we cannot say that this was an abuse of discretion.

Later, on those occasions when plaintiffs referred to either the bracket or the advertisements and defense counsel objected (on several occasions he did not), the objection was either sustained or plaintiffs' counsel withdrew the question. More than once, the jury was instructed to disregard the reference. On the one occasion when defendant's objection was overruled, the court warned plaintiffs' counsel that he must make a trial decision as to whether he wished to risk misdirecting the jury if the bracket issue proved not relevant. No further questions were asked on the subject.

■■■■ Because where specific rulings appear, the trial court with one exception took all the remedial action defendant requested, we can find no prejudice in those rulings. *Martin v. Sloan,* 377 S.W.2d 252, 261 (Mo.1964). Moreover, because on the sole occasion when defendant did not receive the relief requested, plaintiffs' counsel refrained from further questioning, that ruling cannot be characterized as prejudicial. Defendant's point must be denied.[14]

### 6. *Failure to Give Withdrawal Instruction on the Issue of Warning and Guarding*

On this point, defendant appears to couple a complaint as to the court's failure to give withdrawal instructions with a general complaint that no evidence existed from which the jury could find a duty to guard or warn, or that Mr. Duke's injuries resulted from the lack of guard or warning.

■■■■ As to the instruction complaint, we find that this point has not been preserved for review. Defendant did not submit a request for a withdrawal instruction on the issue of *guarding* and did not raise the issue in its motion for new trial. Accordingly, the issue may not be raised now. See Rule 78.07, requiring that "[a]ny specific objections to instructions which were not made at the trial before submission to the jury, must be set forth in the motion for new trial to preserve the error for review." Defendant *did* raise the issue of the court's failure to give a withdrawal instruction on the issue of *warning* in its motion for new trial, but the record does not show that such an instruction was ever submitted. The withdrawal instruction does appear in the legal file,[15] but the transcript of the instruction conference shows no mention of it. Although no explanation is given for the instruction's presence in the file, defendant does not claim to have submitted it or otherwise to have requested a clarification of the verdict director. Accordingly, the point is not preserved for review. *Cox v. Blossom,* 565 S.W.2d 851 (Mo.App.1978).

Turning now to the general complaint that a submissible case of either guarding or warning was lacking, we note that the guarding issue has been discussed above in point four at least as to the duty to guard. As to the injury resulting from the lack of guard, Dr. Creighton's extensive description of the operation of safety guards gave the jury abundant reason to conclude that if a guard had been in place Mr. Duke's hands

**14.** Defendant's reliance on *Ryan v. Campbell "66" Express, Inc.,* 304 S.W.2d 825 (Mo.1975) (en banc), as suggesting that a new trial must be ordered when a party has repeatedly sought introduction of improper evidence is misplaced in that *Ryan* merely held that the trial court acted within its discretion in so ordering. A new trial is clearly not mandated in this situation and, in fact, the *Ryan* court stated at 830 that "were we passing on the matter as an

original proposition, we would have an entirely different question."

**15.** Unnumbered withdrawal instruction:

The issue of the failure of defendant to warn Lewis Duke of the dangers associated with the use of the power press is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.

could not have entered the die area while the ram was descending.

As for the duty to warn of the danger of operating the press without safety guards, we disagree with the trial court and hold that defendant had such a duty and that the jury could have found that the failure to do so resulted in the injury.

Missouri has long recognized that a manufacturer has a duty to warn ultimate users when the product is inherently dangerous. *Morris v. Shell Oil Co.,* 467 S.W.2d 39 (Mo. 1971); *Bean v. Ross Mfg. Co.,* 344 S.W.2d 18, 25 (Mo.1961) (en banc); *Orr v. Shell Oil Co.,* 352 Mo. 288, 177 S.W.2d 608 (1943); *Hill v. General Motors Corp.,* 637 S.W.2d 382 (Mo.App.1982). *See also Griggs v. Firestone Tire and Rubber Co.,* 513 F.2d 851, 856 (8th Cir.), *cert. denied,* 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975) (applying Missouri law and stating that "a manufacturer of inherently dangerous chattels is subject to a legal duty to exercise reasonable care to warn those expected to use the product of the danger presented. Liability is imposed where injury resulting from the use of the product is attributable to a breach of this 'duty to warn' ").

Missouri also recognizes the existence of a strict liability cause of action for failure to warn. *Racer v. Utterman,* 629 S.W.2d 387, 393 (Mo.App.1981); M.A.I. 25.-05. The lack of an adequate warning in itself renders a product defective or unreasonably dangerous within the meaning of product liability law. *Alman Bros. Farm & Feed Mill, Inc. v. Diamond Laboratories, Inc.,* 437 F.2d 1295, 1303 (5th Cir.1971); *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465 (5th Cir.1976); *Gordon v. Niagara Mach. and Tool Works, supra,* at 1190.

Numerous cases have held that when the defense is raised that the injured plaintiff had adequate knowledge of the risks so as to obviate the duty to warn, the question of the adequacy of the knowledge is a question for the jury. For example, in *Fabian v. E.W. Bliss Co.,* 582 F.2d 1257 (10th Cir. 1978), the evidence showed that plaintiff knew that the punch press in question had

double-punched in the past, but had been informed that it had been fixed. The court held that whether plaintiff had full knowledge of the likelihood of double-punching again was for the jury to decide.

Similarly, the court in *Pust v. Union Supply Co.,* 38 Colo.App. 435, 561 P.2d 355 (1976), *aff'd,* 196 Colo. 162, 583 P.2d 276 (1978) (en banc), acknowledged that the question of whether plaintiff knowingly encountered the danger was for the jury and elaborated that defendant must show that the plaintiff had knowledge of the *specific danger* arising out of the precise defects asserted. "A general knowledge of the danger of machinery with moving parts or a general awareness that if part of [the] body were to become caught in the moving parts of the machinery [it would] cause injury is insufficient...." *Id.* 561 P.2d at 362. On remand, defendant was required to show actual knowledge of the specific danger.

Consistent with this language is the rule in *LaPlant v. E.I. Du Pont De Nemours and Co.,* 346 S.W.2d 231, 245 (Mo.App.1961), that no duty exists to warn of common dangers, "for no one needs notice of what he already knows or reasonably may be expected to know."

Thus, the issue here is whether Mr. Duke knew of the danger of operating the press without a guard. The trial court's order of April 6, 1981, indicates that it was of the opinion that Mr. Duke knew of the risk. We cannot agree that the record supports that conclusion. Although Mr. Duke testified that he knew that he could be injured if he put his hands in the die area ("anybody knows that much") and that he had been informed by the night shift that the press was double-tripping, he never acknowledged being aware that he should not use the press without guards. In fact, in his several years of operating this press, he had never used the press with guards.

Because he testified that he *never* put his hands in the die area, knowledge of the double-tripping did not put him on notice to be especially careful not to put his hands in the die area on the day of the accident. He

already knew not to do so. And in fact, he did not do so at the time of the accident. His hands were in the die only because he *fell* into the die area after having been hit in the head. He had received no notice of the likelihood of such an occurrence, and the inference is clear that had a guard been in place, he *could not* have fallen into that space.

This situation is distinguishable from that in *Haines v. Powermatic Houdaille, Inc.,* 661 F.2d 94, 96 (8th Cir.1981), where the court found no error in the magistrate's instruction to the jury that defendant had no duty to warn. There, plaintiff had earlier used the table saw which caused his injury with a guard in place, he knew that the guard was not in place at the time of the accident, he had been told not to use it alone, a sign was posted warning him not to use the saw without a guard, and he knew that he could be hurt if he came in contact with the blade. The only bit of knowledge common to our case is the last. None of the other facts are applicable here, and in fact, rather than having been warned not to use the machine as in *Haines,* Mr. Duke was specifically told by his foreman to use it in spite of the double-tripping.

 The evidence shows no more than a "general awareness" of the danger of machinery and does not indicate knowledge of the specific danger (that absent a guard, he could fall into the die space). The question was one for the jury. As to the sufficiency of evidence whether Mr. Duke would have heeded a warning not to operate the press without a guard, we would agree with the court in *Craven v. Niagara Mach. & Tool Works, Inc.,* 417 N.E.2d 1165, 1171 (Ind.App.1981), that a rebuttable presumption must arise that a warning would be heeded. Defendant has presented no evidence to the contrary.

Accordingly, we hold that a submissible case was made on the issue of failure to warn of the danger of operating the press without guards.

### 7. Verdict Against the Weight of the Evidence

For its final point on appeal, defendant claims that the verdict was against the weight of the evidence. Defendant asserts that the "only credible" evidence "clearly show[ed] that the accident was the result of the jamming of the clevis beyond the detent pin due to the excessive force applied by the modified tripping system."

What defendant seeks here is a substitution of its theory of the cause of the accident for that of the plaintiff Lewis Duke. Because we must view the evidence in the light most favorable to plaintiffs, we cannot agree that such a substitution is warranted. We find substantial credible evidence to support plaintiffs' theory that a number of unreasonably dangerous defects in the press resulted in Mr. Duke's injuries.

For the foregoing reasons, we affirm the judgment of the trial court.

All concur.