# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1445

_____

Athena Bachtel

*Plaintiff - Appellant*

v.

TASER International, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal

_____

Submitted: January 14, 2014
Filed: April 3, 2014

_____

Before LOKEN, MURPHY, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

A Moberly police officer shot Stanley Harlan in the chest with an electronic control device (ECD) after a traffic stop just past midnight on August 28, 2008. Harlan died within two hours, and his mother Athena Bachtel sued the City of Moberly and several police officers under 42 U.S.C. § 1983 for excessive force and deliberate indifference. After that case settled for $2.4 million in June 2009, Bachtel brought this action against manufacturer TASER International, Inc. (TASER) for

products liability and negligence, alleging that TASER was liable for (1) not having provided adequate warnings that direct deployments of the device into the chest could lead to cardiac arrest and (2) having placed a defectively designed product on the market. The district court[1] granted summary judgment to TASER after granting its motion to strike the testimony of Bachtel's two proposed expert witnesses, and Bachtel appeals. We affirm.

I.

At approximately 12:30 a.m. on August 28, 2008, a police officer in Moberly, Missouri stopped Stanley Harlan's car for speeding. The officer thought he smelled alcohol as Harlan got out of the car, and three other Moberly police soon arrived to assist, including Officer Jeremy Baird and Sergeant Carmen Newbrough. The officers state that because Harlan moved away from them and failed to comply with directions to keep his hands out of his pockets, they attempted to restrain him. Harlan resisted, and continued to struggle after the officers were able to cuff one of his hands. Sergeant Newbrough directed Officer Baird to deploy his TASER electronic control device to subdue Harlan, and Baird fired the device from about two feet, sending two darts directly into Harlan's chest. According to the taser's data recorder, Officer Baird fired three times, sending an electrical current into Harlan's chest for 21 seconds, 7 seconds, and 3 seconds respectively. The record indicates that TASER model X26 ECD was the device used.

Harlan fell to the ground and appeared to lose consciousness. According to witnesses, the officers then kicked him, dragged him into the street, and propped him up in a seated position on the ground. By the time paramedics were called and arrived at the scene, they found Harlan "unresponsive, pulseless and apneic i.e. not

---

[1] The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

breathing." Harlan was transported to Moberly Regional Medical Center, where he was pronounced dead at around 2 a.m. The medical examiner determined Harlan's cause of death was "cardiopulmonary arrest shortly after the use of physical restraint and electro-muscular disruption technology device."

Electronic control devices known as tasers entered the market in 1994 and are commonly used by law enforcement agencies across the United States. The specific model used by Officer Baird—the model X26 ECD—had been introduced by TASER International, Inc. in 2003. When fired, the X26 ECD deploys two probes which attach to the body and deliver electrical current into the subject through thin insulated wires. Pulling and releasing the trigger of the X26 ECD results in a 5 second electrical discharge cycle, although an officer may extend the cycle by holding the trigger down. The device produces 19 electrical pulses per second, each pulse lasting about 100 microseconds and delivering a mean current of 580 volts. The electrical current forces the subject's muscles to contract, temporarily limiting muscle control and allowing police officers time to subdue the individual.

TASER shipped each X26 ECD with a product manual containing user instructions, safety instructions, and product warnings for the device. It also provides an instructor training program that certifies law enforcement officers for training end users of the device within their own agencies. To maintain certification, these instructors must take an additional course every two years. TASER provides written training materials to certified instructors for use in training officers in their own agencies. The company updates these materials annually and sends the updated training materials, operating manuals, and product warnings directly to all certified trainers, in addition to posting them on its website. Certified trainers are also instructed to refer to TASER's website a few days before conducting a training program to ensure they have the most recent materials. Updated materials supersede all prior versions.

The X26 control device used by Officer Baird after Harlan's traffic stop had been shipped by TASER to the Moberly police department on June 15, 2004, together with the 2004 operating manual and version 11 training CD. The 2004 operating manual contained the following warning:

> [T]he very nature of physical confrontation involves a degree of risk that someone . . . may [] be killed due to unforeseen circumstances and individual susceptibilities. Accordingly, the TASER X26 . . . should only be deployed in situations where the alternative would be to use other force measures which carry similar or higher degrees of risk.

The first sentence was repeated in updated warnings released March 2007. These revised warnings also urged officers to "[b]egin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject."

The version 13 training materials released in May 2006 warned users to "Avoid Extended or Repeated TASER Device Applications Where Practicable" and to "only apply the number of [5 second] cycles reasonably necessary to allow them to safely restrain the subject." The materials recommended officers avoid extended or repeated TASER applications directly to the chest because they "may cause sufficient muscle contractions to impair normal breathing patterns." This training also specified that when firing from a close proximity, an officer should "[c]onsider targeting the waist area to put one probe above the waist and one below the waist for enhanced effectiveness."

Sergeant Troy Link became the department's certified ECD instructor in April 2004, and in this role he regularly received emails from TASER with the updated training bulletins and materials. Nevertheless, when Sergeant Link conducted Officer Baird's training in October 2007, he used a modified and truncated form of the version 12 training program which had been released in January 2005. This 2005

training program had been superseded by version 13 in May 2006. In training Officer Baird, Sergeant Link had also not distributed the March 2007 updated law enforcement product warnings, nor played any of the provided training videos or used TASER's scenario based training exercises. In his training program for use of the ECD, Sergeant Link had officers fire only one live charge instead of the four recommended by the manufacturer, and he had limited the entire training program to four hours. Sergeant Link also did not circulate any updated TASER warnings or bulletins after this initial training session ended.[2]

Based on his training by TASER, Sergeant Link instructed officers that "[t]he back is the preferred location of deployment." He explained that shooting the center of body mass from the front is "not ideal" because there is less muscle mass in the chest and thus an ECD deployment there would be less effective. He testified that this advice should only be disregarded "[i]n a scenario where a single officer is faced with a combative individual" and is unable to maneuver and target the individual's back. This training was disregarded by Officer Baird on the night of August 28 when he fired directly at Harlan's chest from close proximity and for an extended period of time and in the presence of three other officers able to assist.

Harlan's mother, Athena Bachtel, brought an excessive force and deliberate indifference case against the City of Moberly, Officer Baird, and Sergeant Newbrough under 42 U.S.C. § 1983. That case settled in June 2009 for $2.4 million. While the complete terms of the settlement with the city and the police are not clear from this record, the media reported that the agreement included a moratorium on the

_____

[2] The unanticipated death of Stanley Harlan was unfortunately not unique. Just three years ago in another case involving the death of a young man after employment of a taser, we expressed concern about unintended consequences from taser use by insufficiently trained law enforcement officers. See McKenney v. Harrison, 635 F.3d 354, 363 (8th Cir. 2011) (Murphy, J., concurring).

use of tasers by the Moberly police department until a revised taser policy was issued and automatic external defibrillators were installed in on duty patrol cars.[3]

Bachtel brought the present lawsuit on August 19, 2011 against TASER International under Missouri tort law, alleging that the X26 ECD used by Officer Baird was a contributing factor causing her son's death. She asserts both strict liability and negligence on the grounds that (1) TASER failed to provide adequate warnings that prolonged or repeated chest applications of the X26 ECD could lead to ventricular fibrillation and cardiac arrest, and (2) TASER's X26 ECD was defectively designed. TASER removed the case to federal court and moved to exclude the warnings and design defect opinions of Bachtel's proposed expert, Dr. Douglas Zipes. It also moved to strike the expert report of Bachtel's proposed rebuttal expert, Dr. Robert J. Myerburg.

The district court granted TASER's motion to exclude the proposed opinion testimony of Dr. Zipes on the adequacy of the warnings, testing, and design of the device after concluding that he lacked sufficient experience and expertise on those subjects. The district court also granted TASER's motion to strike the report of Dr. Myerburg for its untimely submission. TASER subsequently moved for summary judgment on all claims, and the district court granted its motion. Bachtel appeals the district court's grant of summary judgment to TASER on her claims of strict liability failure to warn, negligent failure to warn, and strict liability design defect. She also argues that the court abused its discretion in excluding the testimony of her expert witnesses and that she is entitled to punitive damages.

---

[3] T.J. Greaney, <u>Moberly settles in Taser death</u>, COLUMBIA DAILY TRIBUNE, June 23, 2009, http://www.columbiatribune.com/news/local/moberly-settles-in-taser-death/article_3d6e05b7-4c42-5c5a-b7fe-edfdbe61c5cf.html

II.

We review the district court's summary judgment de novo, viewing the evidence in the light most favorable to nonmovant Bachtel and giving her the benefit of all reasonable inferences. Bell v. Pfizer, Inc., 716 F.3d 1087, 1091 (8th Cir. 2013). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(a)). A district court grant of summary judgment may be affirmed on any ground supported by the record. Pro Serv. Auto., L.L.C. v. Lenan Corp., 469 F.3d 1210, 1213 (8th Cir. 2006). A district court's determination that expert testimony is necessary on an issue is reviewed for abuse of discretion. Menz v. New Holland N. Am., Inc., 507 F.3d 1107, 1111 (8th Cir. 2007). An abuse of discretion standard is also used to review a district court's exclusion of expert testimony. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Since Missouri substantive law governs, see Menz, 507 F.3d at 1110–11, we are bound by relevant decisions of the Missouri Supreme Court, B.B. v. Cont'l Ins. Co., 8 F.3d 1288, 1291 (8th Cir. 1993). If the Missouri Supreme Court has not addressed an issue, we must determine what that court would likely hold if it were to reach it. Id.

A.

To prevail on her strict liability claim for failure to warn under Missouri law, Bachtel must show that (1) TASER sold the X26 ECD in the course of its business; (2) at the time of sale the X26 ECD was unreasonably dangerous if put to a reasonably anticipated use without knowledge of its characteristics; (3) TASER did not give adequate warning of the danger; (4) the X26 ECD was used in a reasonably anticipated manner; and (5) Harlan was damaged as a result of the X26 ECD being sold without an adequate warning. See Moore v. Ford Motor Co., 332 S.W.3d 749, 756 (Mo. 2011) (en banc) (citing Tune v. Synergy Gas Corp., 883 S.W.2d 10, 13 (Mo. 1994) (en banc)). To establish the fifth element of causation, Bachtel must

demonstrate both that the product caused Harlan's death and that a warning would have altered the behavior of the officers involved in the incident. Moore, 332 S.W.3d at 761–62 (internal citation omitted); see also Tenbarge v. Ames Taping Tool Sys., Inc., 190 F.3d 862, 866 (8th Cir. 1999). We conclude that Bachtel's failure to warn claim fails as a matter of law because she did not establish on the record made in the district court that an additional warning would have changed the behavior of the officers involved in Harlan's stop.

The district court concluded that because Bachtel failed to provide expert testimony that additional warnings could have altered Officer Baird's behavior, that claim failed. While Missouri law does not require expert testimony in all strict products liability cases, "[s]uch testimony is necessary . . . where the lay jury does not possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help." Menz, 507 F.3d at 1111 (internal quotation omitted). This determination turns on the complexity of the subject matter at issue. Id. Missouri courts have previously concluded that "[w]arnings and how people react to warnings are arguably subjects about which persons having no particular training are incapable of forming accurate opinions." Cole v. Goodyear Tire & Rubber Co., 967 S.W.2d 176, 185 (Mo. Ct. App. 1998); see also Menz, 507 F.3d at 1112. This is particularly true in a case which turns on the effect of a warning on a police officer involved in a physical confrontation in the field. The district court did not abuse its discretion in determining such expert testimony was required here. See Menz, 507 F.3d at 1112.

Bachtel responds that its proposed expert, Dr. Zipes, was qualified to testify on the adequacy of the warnings provided by TASER, and that the district court abused its discretion in excluding this testimony. An expert determined to be qualified in one subject matter does not thereby become an expert for all purposes. See Robertson v. Norton Co., 148 F.3d 905, 907–08 (8th Cir. 1998). While Dr. Zipes was deemed to be an expert on electrophysiology and the impact of electrical impulses on heart

rhythm, he admitted that he had had no experience in crafting warnings for law enforcement weapons, tools, or equipment. Moreover, he was not familiar with law enforcement training protocols or use of force guidelines, and he lacked specific knowledge about Officer Baird's training or expertise in how such training would impact an officer's actions in the field. We conclude that the district court did not abuse its discretion in excluding Dr. Zipe's testimony on the issue of whether a different or additional warning would have altered Officer Baird's actions under the existing circumstances. See Menz, 507 F.3d at 1111–12.

Bachtel argues that in any event she is entitled to a presumption under Missouri law that an adequate warning would have been read and heeded by Officer Baird if provided. Missouri law supplies a heeding presumption "if the plaintiff shows that no warning was given" and where there is a "legitimate jury question whether [the user] did not already know the danger." Tenbarge, 190 F.3d at 866 (quoting Arnold v. Ingersoll-Rand Co., 834 S.W.2d 192, 194 (Mo. 1992) (en banc)). Such a presumption may be rebutted by evidence that a police officer would not have read or heeded an additional warning. See id. at 866–67; Smith v. Brown & Williamson Tobacco Corp., 275 S.W.3d 748, 786 (Mo. Ct. App. 2008). While rebuttal evidence typically creates a jury question as to causation, we explained in interpreting an Arkansas heeding presumption that "[i]f the defendant produces [rebuttal] evidence so strong that it would necessarily persuade any reasonable trier of fact that an adequate warning would have been futile, the defendant is entitled to have causation determined as a matter of law." Boerner v. Brown & Williamson Tobacco Corp., 260 F.3d 837, 844–45 (8th Cir. 2001). We also pointed out in Boerner that evidence showing a user failed to read available warnings is the type of evidence that can rebut the presumption as a matter of law. Id. at 845 (citing Bushong v. Garman Co., 843 S.W.2d 807, 811 (Ark. 1992)); see also Johnson v. Medtronic, Inc., 365 S.W.3d 226, 232–33 (Mo. Ct. App. 2012); Johnson v. Niagara Mach. & Tool Works, 666 F.2d 1223, 1225 (8th Cir. 1981) (applying Minnesota law).

To establish a rebuttable presumption that Officer Baird would have read and heeded an adequate warning, Bachtel must demonstrate that there is "a legitimate jury question" as to whether Officer Baird knew of the "specific danger that caused [Harlan's] injury." Smith, 275 S.W.3d at 785 (internal citations omitted). Officer Baird pleaded the Fifth Amendment and did not testify in this case, and thus direct evidence of his knowledge is unavailable. The record shows, however, that the outdated version 12 training program handouts used in Officer Baird's training included a chart indicating that the electrical output of the X26 ECD could not cause ventricular fibrillation when applied in 5 second increments directly to a subject's chest. Moreover, Sergeant Link testified that he trained officers to aim for "center mass" when they were employing the device against a combative individual without the support of other officers. Even if we were to conclude that there were a legitimate jury question as to whether Officer Baird had been made aware of the specific risk of cardiac danger when the X26 ECD is fired directly at a subject's chest, such a conclusion would be rebuttable by undisputed evidence in the record that he had not been instructed on available warnings and did not heed the limited training he had received.

Both parties agree that when Sergeant Link conducted Officer Baird's training in October 2007, he used TASER's version 12 training manual issued in January 2005 despite the fact that this program had been superseded by version 13 in May 2006. Moreover, Sergeant Link testified that he had not distributed any product manuals or warnings at the training, nor had he circulated updated training bulletins after Officer Baird completed his officer training session. We conclude that the record shows that Officer Baird never read the warning in the 2004 operating manual that "the very nature of physical confrontation involves a degree of risk that someone . . . may [] be killed due to unforeseen circumstances and individual susceptibilities." Officer Baird also did not read the available March 2007 product warning urging officers to "[b]egin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the

-10-

subject." Nor did he read the updated instructions in the version 13 training materials to avoid extended or repeated TASER applications directly to the chest. We conclude that there is no genuine dispute on this record that Officer Baird would not have read any additional warning TASER may have added as to the cardiac danger of the X26 ECD in any of its product warnings or bulletins, or in any training materials prepared after January 1, 2005.[4]

The record further indicates that Officer Baird did not heed the instructions Sergeant Link had provided in his truncated training program. Sergeant Link had instructed officers that "[t]he back is the preferred location of deployment," and an officer should only take a chest shot "[i]n a scenario where a single officer is faced with a combative individual" and is unable to maneuver to target the individual's back. Despite this training, Officer Baird fired directly at Harlan's chest from two feet away, even when three other officers were at the scene and one of Harlan's hands had already been cuffed without the use of force. Moreover, the outdated version 12 training program that Sergeant Link had used in Officer Baird's training contained a slide instructing officers to use each "5-second cycle" as an opportunity to "go hands on" and cuff the individual. Officer Baird disregarded this instruction when he fired the device for over 20 seconds in its first deployment. On this record, we conclude that even if an adequate warning had appeared in the version 12 training program, Officer Baird would not have heeded it. The presumption that Officer Baird would have read and heeded a warning as to the cardiac danger of firing the X26 ECD at a subject's chest is therefore unavailable as a matter of law. See Boerner, 260 F.3d at 844–45.

Under Missouri law "the causation elements are the same for both strict liability and negligent failure to warn," Smith, 275 S.W.3d at 788 n.107, although

---

[4] The earliest study Bachtel has identified as purportedly indicating the risk of cardiac danger from the use of a TASER ECD was published in February 2005.

negligence claims require additional proof, <u>Menz</u>, 507 5.3d at 1115 (citing <u>Peitzmeier v. Hennessy Indus., Inc.</u>, 97 F.3d 293, 296 n.2 (8th Cir. 1996)). Thus, Bachtel's failure to establish that an additional warning would have altered the behavior of Officer Baird is necessarily fatal to her negligence claim for failure to warn. <u>See</u> <u>id.</u> Accordingly, TASER is entitled to summary judgment on both.

B.

To recover under a strict liability claim for defective design, Missouri law requires Bachtel to demonstrate that (1) TASER sold the X26 ECD in the course of its business; (2) the X26 ECD was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; (3) the X26 ECD was used in a manner reasonably anticipated; and (4) Harlan was injured as a direct result of such defective condition as it existed when the product was sold. <u>Linegar v. Armour of Am., Inc.</u>, 909 F.2d 1150, 1152 (8th Cir. 1990) (citing <u>Fahy v. Dresser Indus.</u>, 740 S.W.2d 635, 637–38 (Mo. 1987) (en banc)). Missouri courts emphasize that a manufacturer's liability is based on "the condition or character of the product and not the character of the defendant's conduct." <u>Nesselrode v. Exec. Beechcraft, Inc.</u>, 707 S.W.2d 371, 375 (Mo. 1986) (en banc) (citing <u>Blevins v. Cushman Motors</u>, 551 S.W.2d 602, 608 (Mo. 1977) (en banc)). In a submissible case for design defect, "the plaintiff bears the burden of demonstrating that the product, <u>as designed</u>, is unreasonably dangerous and therefore defective." <u>Id.</u> (emphasis added) (internal quotation marks omitted).

Bachtel's design defect claim is based solely on the fact that the X26 ECD can be lethal and is therefore unreasonably dangerous. Under Missouri law, however, "strict tort liability is not, nor was it ever intended to be, an enveloping net of absolute liability." <u>Crump v. Versa Prod., Inc.</u>, 400 F.3d 1104, 1108 (8th Cir. 2005) (quoting <u>Nesselrode</u>, 707 S.W.2d at 375)). Indeed, Missouri courts have explained that under strict liability a manufacturer is not intended to be an insurer for any and all injuries

-12-

caused by its products. Nesselrode, 707 S.W.2d at 375 (citing Baker v. Int'l Harvester Co., 660 S.W.2d 21, 23 (Mo. Ct. App. 1983)). The fact of an injury alone is therefore insufficient to prove the unreasonable dangerousness of a product in a design defect case.

The Missouri cases based on design defects are instructive and controlling here. In Stinson v. E.I. DuPont De Nemours and Company, 904 S.W.2d 428, 431 (Mo. Ct. App. 1995), the plaintiff created a submissible case on design defect with evidence that the defendant's paint was designed to include a chemical known to be "the second most toxic substance . . . in the world today" and the most common cause of occupational asthma in the country, known to cause permanent lung damage, and known to create sensitivity in seven percent of people exposed to the substance. Similarly in Smith v. Brown & Williamson Tobacco Corporation, the Missouri Court of Appeals found there was sufficient evidence to submit a design defect claim to the jury because "[t]he evidence presented went beyond a categorical attack on the danger of cigarettes in general," and instead "demonstrated specific design choices" by the defendant that had the potential to harm the plaintiff's health. 275 S.W.3d at 796. This evidence included testimony provided by a former employee of the defendant cigarette company who testified that the cigarettes in issue "contained more free nicotine than any other cigarette on the market." Id. at 795.

We conclude that Bachtel has failed to present evidence that the X26 ECD used by Officer Baird was unreasonably dangerous as designed. The evidence Bachtel points to in her brief on appeal establishes only a link between the device and the injury. That evidence includes the testimony of Dr. Zipes that electrical current can capture heart rhythm, audio and video recordings of the Harlan stop, and eyewitness accounts about Harlan's response to the electrical current the taser injected into his chest. Since Bachtel has failed to demonstrate any "specific design choices" that rendered the model X26 ECD unreasonably dangerous, her claim fails as a matter of law.

-13-

## III.

Since the City of Moberly and its police department have settled the claims brought against them by Harlan's mother, the appeal before our court focuses only on whether Athena Bachtel has shown that TASER International has made a defective product which caused her son's death by insufficient warnings. We conclude that Bachtel has failed to meet her burden of proof to survive summary judgment. Accordingly, we affirm the judgment of the district court and dismiss Bachtel's remaining claims on appeal as moot.

_____